Nathan R. Ring
Nevada Bar No. 12078
**STRANCH, JENNINGS & GARVEY PLLC**
3100 W. Charleston Blvd., Ste. 208
Las Vegas, Nevada 89102
(725) 235-9750
nring@stranchlaw.com

[*Additional counsel on signature page]*

***Attorneys for Plaintiff and the Class***

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| **ROCCI FERRETTA**, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>**STATION CASINOS, LLC**,<br><br>Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT** |

Plaintiff Rocci Ferretta ("Plaintiff"), individually and on behalf of all others similarly situated, brings this action against Defendant Station Casinos, LLC ("Defendant"), to obtain damages, restitution, and injunctive relief for the Class, as defined below, from Defendant. Plaintiff makes the following allegations upon information and belief, except as to their own actions, the investigation of their counsel, and the facts that are a matter of public record:

## NATURE OF THE ACTION

1. This Class Action arises from Defendant's failure to secure the personally identifiable information ("PII"[1] or "Private Information") of Plaintiff and the members of the proposed Class, following a cyberattack (the "Data Breach").

2. Defendant is an American hotel and casino company.

[1] The Federal Trade Commission defines "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among

3. Plaintiff and Class Members are comprised of individuals who received services from Defendant.

4. Defendant recently disclosed that it suffered unauthorized activity on its IT Network that resulted in the exfiltration of files containing sensitive Private Information.[2]

5. Defendant became aware of the Data Breach on March 5, 2026.[3]

6. Upon information and belief, the following types of Private Information were compromised as a result of the Data Breach: name, financial account numbers, dates of birth, driver's license numbers, email addresses, phone numbers, payment information, card information, and Social Security numbers.[4]

7. Upon information and belief, cybercriminals had unfettered access and acquired Plaintiff's and Class Members' Private Information from the Defendant's systems for an extended period of time. The hackers were able to infiltrate Defendant's information systems and perform malicious activity—likely including reconnaissance and data exfiltration functions that should have had alarm bells ringing.

8. Thus, Defendant failed to implement reasonable, industry standard cybersecurity safeguards sufficient to detect malicious activity in a timely manner, including monitoring, logging, and alerting systems such as EDR, XDR, data loss prevention tools, and centralizing alerting and logging.

9. Upon information and belief, Plaintiff's Private Information is available on the dark web as a result of the Data Breach.

10. Given the Defendant's failure in even the most basic requirements of cybersecurity, it is likely that Defendant's cybersecurity program as a whole is severely inadequate in comparison to the measures it is legally obligated to provide to individuals for whom it collects Private Information, thus leaving them exposed to the Data Breach that indeed came into fruition.

---

other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 17 C.F.R. § 248.201(b)(8).

[2] Jerome Garcia, *Station Casino Reveals Data Breach Took Place in March 2026*, GAMBLING NEWS (May 26, 2026) https://www.gamblingnews.com/news/station-casinos-reveals-data-breach-took-place-in-march-2026/.

[3] *Id.*

[4] *Id.*

11. In other words, Defendant had no effective means to prevent, detect, stop, or mitigate breaches of its systems—thereby allowing cybercriminals unrestricted access to Plaintiff's and Class Members' Private Information.

12. Further, Defendant's failure to issue notice has obfuscated the nature of the breach and the threat it poses by refusing to tell Plaintiff and Class Members, among other things, how the breach occurred, how long the cybercriminals had access to Defendant's network and servers; or how many people were impacted.

13. Defendant's delay in informing and failure to provide clear notice of the Data Breach even though Plaintiff and Class Members had their most Private Information accessed, exfiltrated, and stolen, caused Plaintiff and Class Members to suffer ascertainable losses in the form of the loss of the benefit of their bargain and the value of their time reasonably incurred to remedy or mitigate the effects of the attack.

14. As a result of the Data Breach, Plaintiff and Class Members, suffered concrete injuries in fact including, but not limited to: (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

15. The Data Breach was a direct result of Defendant's failure to implement adequate and reasonable cyber-security procedures and protocols necessary to protect Plaintiff's and Class Members' Private Information from a foreseeable and preventable cyber-attack.

16. Defendant maintained, used, and shared Private Information in a reckless manner. In particular, the Private Information was used and transmitted by Defendant in a condition vulnerable to cyberattacks. Upon information and belief, the mechanism of the cyberattack and potential for improper

disclosure of Plaintiff's and Class Members' Private Information was a known risk to Defendant, and thus, Defendant was on notice that failing to take steps necessary to secure the Private Information from those risks left that property in a dangerous condition.

17. Defendant disregarded the rights of Plaintiff and Class Members by, inter alia, intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure its data systems were protected against unauthorized intrusions; failing to take standard and reasonably available steps to prevent the Data Breach; and failing to provide Plaintiff and Class Members prompt and accurate notice of the Data Breach.

18. Plaintiff's and Class Members' identities are now at risk because of Defendant's negligent conduct, as the Private Information that Defendant collected and maintained has been accessed and acquired by data thieves.

19. Plaintiff and Class Members may also incur out of pocket costs, including to purchase credit monitoring services, credit freezes, credit reports, or other protective measures to deter and detect identity theft.

20. As a result of the Data Breach, Plaintiff and Class Members have been exposed to a heightened and imminent risk of fraud and identity theft. Plaintiff and Class Members must now and in the future closely monitor their financial accounts to guard against identity theft.

21. Plaintiff brings this class action lawsuit on behalf all those similarly situated to address Defendant's inadequate safeguarding of Class Members' Private Information that it collected and maintained, and for failing to provide timely and adequate notice to Plaintiff and other Class Members that their information had been subject to the unauthorized access by an unknown third party and precisely what specific type of information was accessed.

22. Through this Complaint, Plaintiff seeks to remedy these harms on behalf of himself and all similarly situated individuals whose Private Information was accessed during the Data Breach.

23. Plaintiff and Class Members have a continuing interest in ensuring that their information is and remains safe because Defendant still has possession of their immutable information, thus entitling Plaintiff and the Class to injunctive and other equitable relief.

24. The exposure of the Private Information to cybercriminals is a bell that cannot be unrung. Before this Data Breach, their Private Information was exactly that—private. Not anymore. Now, their Private Information is forever exposed and unsecure.

## **PARTIES**

25. Plaintiff is a resident and citizen of California, where he intends to remain.

26. Defendant is a domestic limited liability company with its principal place of business at 1505 S. Pavilion Center Drive, Las Vegas, Nevada, 89135.

## **JURISDICTION AND VENUE**

27. This Court has subject matter jurisdiction over this action under 28 U.S.C.§ 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class, namely Plaintiff, a citizen of California, is a citizen of a state different from Defendant.

28. This Court has personal jurisdiction over Defendant because its principal place of business is in this District, it regularly conducts business in this District, and the acts and omissions giving rise to Plaintiff's claims occurred in and emanated from this District.

29. Venue is proper under 18 U.S.C § 1391(b)(1) because Defendant's principal place of business is in this District.

## **FACTUAL ALLEGATIONS**

***Defendant's Business***

30. Defendant is an American hotel and casino company.

31. Plaintiff and Class Members are comprised of individuals who received services from Defendant.

32. As a part of its business, Defendant received, collected, and maintained the highly sensitive Private Information of Plaintiff and Class Members. In doing so, Defendant implicitly promises to safeguard their Private Information.

33. As a condition of receiving services from Defendant, Plaintiff and Class Members were required to provide Defendant with their Private Information and in return they reasonably expected that Defendant would safeguard their highly sensitive and confidential information.

34. Plaintiff and Class Members have taken reasonable steps to maintain the confidentiality of their Private Information. Plaintiff and Class Members relied on Defendant to keep their Private Information confidential and securely maintained, and to make only authorized disclosures of this information.

35. On information and belief, Defendant has not implemented reasonable cybersecurity safeguards or policies to protect its Plaintiff's and Class Members' Private Information or supervised its IT or data security agents and employees to prevent, detect, and stop breaches of its systems. As a result, Defendant leaves significant vulnerabilities in its systems for cybercriminals to exploit and gain access to Plaintiff's and Class Members' Private Information.

***The Data Breach***

36. Despite its duties and alleged commitments to safeguard Private Information, Defendant did not in fact follow industry standard practices in securing Plaintiff's and the Class Members' Private Information, as evidenced by the Data Breach.

37. Defendant has obligations created by the FTC Act, contract, common law, and industry standards to keep Plaintiff's and Class Members' Private Information confidential and to protect it from unauthorized access and disclosure.

38. Defendant recently disclosed that it suffered unauthorized activity on its IT Network that resulted in the exfiltration of files containing sensitive Private Information.[5]

39. Defendant became aware of the Data Breach on March 5, 2026.[6]

40. Upon information and belief, the following types of Private Information were compromised as a result of the Data Breach: name, financial account numbers, dates of birth, driver's

[5] Jerome Garcia, *Station Casino Reveals Data Breach Took Place in March 2026*, GAMBLING NEWS (MAR. 26, 2026), https://www.gamblingnews.com/news/station-casinos-reveals-data-breach-took-place-in-march-2026/.

[6] *Id.*

license numbers, email addresses, phone numbers, payment information, card information, and Social Security numbers.[7]

41. The risk of identity theft and unauthorized use of Plaintiff's and Class Members' Private Information is substantially high in the wake of the Data Breach. The fraudulent activity resulting from the Data Breach may not come to light for years.

42. Because of Defendant's Data Breach, the sensitive Private Information of Plaintiff and Class Members was placed into the hands of cyber criminals—inflicting numerous injuries and significant damages upon Plaintiff and Class Members.

43. Through its inadequate security practices, Defendant exposed Plaintiff's and the Class's Private Information for theft and sale on the dark web.

44. Moreover, on information and belief, cybercriminals have already leaked the stolen Private Information.

45. The Data Breach is the direct result of Defendant's failure to implement basic data security measures over consumers' data in its custody and control. Had Defendant implemented reasonable cybersecurity measures—including adequate safeguards for initial access, encryption, or redaction of personal data elements, and sufficient logging, monitoring, and alerting tools to detect unauthorized activity—cybercriminals would not have been able to hack into Defendant's network, perform reconnaissance necessary to locate Plaintiff's and Class Members' Private Information, and then exfiltrate that data before being detected.

46. The fact that cybercriminals were able to infiltrate Defendant's information systems, locate these valuable files, gain permission to these files, and download the files—without being stopped by Defendant—shows how poor Defendant's cybersecurity program was at the time of the Data Breach. Basic safeguards for monitoring activity on a company's network for anomalous and malicious activity should have identified the cybercriminals operations, especially when they began removing files.

47. Further, even if these systems were in place, it is likely that Defendant failed to follow the basics to ensure such systems were logging alerts to a centralized system such that Defendant's employees

---

[7] *Id.*

would be empowered to respond to pertinent alerts. None of this appears to have occurred here. Thus, on information and belief, Defendant failed to take even slight care to guard against the highly foreseeable risk of a data breach.

48. As the Data Breach and its timeline evidences, Defendant did not use reasonable data security measures appropriate to the nature of the sensitive Private Information collected from Plaintiff and Class Members and maintained on Defendant's network server(s), such as encrypting the information, deleting the data from Defendant's server when it was no longer needed, requiring sufficient verification such as multi-factor authentication for accounts with access servers storing Private Information, training employees about cybersecurity and attempts to gain unauthorized access, investigating and addressing vulnerabilities in its data security practices, and/or implementing the necessary safeguards to enable Defendant to identify malicious activity and curtail it when it happens. These failures allowed and caused cybercriminals to target Defendant's network systems and carry out the Data Breach.

49. Given the Defendant's failure in even the most basic requirements of cybersecurity, it is likely that Defendant's cybersecurity program as a whole is severely inadequate in comparison to the measures it is legally obligated to provide to individuals for whom it collects Private Information, thus leaving them exposed to the Data Breach that indeed came into fruition.

50. Given that the hackers were able to infiltrate Defendant's information systems for an extended period of time and perform malicious activity—including reconnaissance and exfiltration functions that should have had alarm bells ringing—it is likely that Defendant failed to implement reasonable, industry standard cybersecurity safeguards sufficient to detect malicious activity in a timely manner, including monitoring, logging, and alerting systems such as EDR, XDR, data loss prevention tools, and centralizing alerting and logging.

51. Defendant could and should have prevented this Data Breach by ensuring its files and servers containing Plaintiff's and Class Members' Private Information were properly secured, sanitized, and encrypted and by using appropriate clearinghouse practices to purge consumer data that it was no longer required to maintain, but they failed to do so.

52. Defendant could and should have properly monitored its network for unauthorized access and unusual activity, including the downloading of large amounts of sensitive personal information from its network.

53. Additionally, Defendant could have prevented the Data Breach by examining, testing, and updating its cybersecurity practices to ensure vulnerabilities were identified and addressed and reasonable safeguards were continuously maintained, but failed to do so.

54. Defendant's tortious conduct and breach of contractual obligations, as detailed herein, are evidenced by its failure to identify the scope of information involved and/or individuals impacted by the Data Breach until months after cybercriminals breached its network and accessed Plaintiff's and Class Members' Private Information stored therein—meaning Defendant had no effective means in place to ensure that cyberattacks were detected, prevented, or timely investigated.

55. Defendant's negligence in safeguarding Plaintiff's and Class Members' Private Information is exacerbated by the repeated warnings and alerts regarding the need to protect and secure sensitive data, as well as the ubiquitous nature of data breaches.

56. As a result of the Data Breach, Plaintiff and Class Members now face an increased risk of fraud and identity theft, among many other actual and imminent damages.

57. Moreover, Plaintiff and Class Members have an interest in ensuring that their Private Information, which is believed to remain in the possession of Defendant, is protected from further breaches.

***<u>The Data Breach Was a Foreseeable Risk of Which Defendant Was on Notice</u>***

58. Plaintiff and Class Members value their Private Information, as in today's electronic-centric world, their Private Information is required for numerous activities, such as new registrations to websites, or opening a new bank account, as well as signing up for special deals.

59. In light of recent high profile data breaches, Defendant knew or should have known that its electronic records would be targeted by cybercriminals.

60. In 2024, there were 3,158 data breaches with 1,350,835,988 victim notices, a 211% increase year over year. [8]

61. In April 2020, ZDNet reported, in an article titled "Ransomware mentioned in 1,000+ SEC filings over the past year," that "[r]ansomware gangs are now ferociously aggressive in their pursuit of big companies. They breach networks, use specialized tools to maximize damage, leak corporation information on dark web portals, and even tip journalists to generate negative news for companies as revenge against those who refuse to pay."

62. In September 2020, the United States Cybersecurity and Infrastructure Security Agency published online a "Ransomware Guide" advising that "[m]alicious actors have adjusted their ransomware tactics over time to include pressuring victims for payment by threatening to release stolen data if they refuse to pay and publicly naming and shaming victims as secondary forms of extortion." [9]

63. Data breaches such as the one experienced by Defendant have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service have issued a warning to potential targets so they are aware of, can prepare for, and hopefully can ward off a potential attack.

64. These significant increases in attacks to companies that store Private Information, and attendant risk of future attacks, are widely known to the public and to anyone in that industry, including Defendant.

65. This readily available and accessible information confirms that, prior to the Data breach, Defendant knew or should have known that (i) ransomware actors were targeting entities such as Defendant, (ii) ransomware gangs were ferociously aggressive in their pursuit of entities such as Defendant, (iii) ransomware gangs were leaking corporate information on dark web portals, and (iv) ransomware tactics included threatening to release stolen data.

66. Before the Data Breach, Defendant knew or should have known that there was a foreseeable risk that Plaintiff's and Class Members' Private Information could be accessed, exfiltrated,

---

[8] 2024 DATA BREACH REPORT 6, IDENTITY THEFT RES. CTR. (Jan. 2025), https://www.idtheftcenter.org/wp-content/uploads/2025/02/ITRC_2024DataBreachReport.pdf.
[9] *Stop Ransomware Guide*, CISA, https://www.cisa.gov/stopransomware/ransomware-guide (last visited Apr. 10, 2026).

and published as a result of a cyberattack. Notably, data breaches are prevalent in today's society therefore making the risk of experiencing a data breach entirely foreseeable to Defendant.

67. Defendant knew or should have known that it should have encrypted Plaintiff's and Class Members' Private Information to protect against their publication and misuse in the event of a cyberattack.

***Defendant Could Have Prevented the Data Breach***

68. Data breaches are preventable.[10] Indeed, the American Bar Association published a treatise titled the Data Breach and Encryption Handbook wherein the author explained that:

a. "In almost all cases, the data breaches that occurred could have been prevented by proper planning and the correct design and implementation of appropriate security solutions." [11]

b. "Organizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised[.]"[12]

c. "Most of the reported data breaches are a result of lax security and the failure to create or enforce appropriate security policies, rules, and procedures . . . . Appropriate information security controls, including encryption, must be implemented and enforced in a rigorous and disciplined manner so that a data breach never occurs."[13]

***Defendant Failed to Comply with FTC Guidelines***

69. The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

70. In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cyber-security guidelines for businesses. The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information

---

[10] Lucy L. Thomson, *Despite the Alarming Trends, Data Breaches Are Preventable*, DATA BREACH & ENCRYPTION HANDBOOK (2012).
[11] *Id.* at 17.
[12] *Id.* at 28.
[13] *Id.*

that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[14]

71. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

72. The FTC further recommends that companies not maintain Private Information longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

73. The FTC has brought enforcement actions against businesses for failing to protect customer data adequately and reasonably, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

74. Defendant failed to properly implement basic data security practices, and its failure to employ reasonable and appropriate measures to protect against unauthorized access to individuals' Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

75. Defendant was at all times fully aware of its obligation to protect the Private Information of Plaintiff and Class Members. Defendant was also aware of the significant repercussions that would result from its failure to do so.

---

[14] *Protecting Personal Information: A Guide for Business*, FED. TRADE COMM'N (Oct. 2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

***Defendant Failed to Comply with Industry Standards***

76. As shown above, experts studying cyber security routinely identify businesses such as the Defendant as being particularly vulnerable to cyberattacks because of the value of the Private Information which they collect and maintain.

77. To prevent and detect unauthorized cyber-attacks, Defendant could and should have implemented, as recommended by the United States Government, the following measures:

- Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.
- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.
- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.
- Configure firewalls to block access to known malicious IP addresses.
- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.
- Set anti-virus and anti-malware programs to conduct regular scans automatically.
- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.
- Configure access controls—including file, directory, and network share permissions—with at least privilege in mind. If a user only needs to read specific files, the user should not have written access to those files, directories, or shares.
- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.
- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.
- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.
- Execute operating system environments or specific programs in a virtualized environment
- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[15]

78. To prevent and detect cyber-attacks, including the cyber-attack that resulted in the Data Breach, Defendant could and should have implemented, as recommended by the United States Cybersecurity & Infrastructure Security Agency, the following measures:

- **Update and patch your computer**. Ensure your applications and operating systems (OSs) have been updated with the latest patches. Vulnerable applications and OSs are the target of most ransomware attacks . . . .
- **Use caution with links and when entering website addresses**. Be careful when clicking directly on links in emails, even if the sender appears to be someone you know. Attempt to independently verify website addresses (e.g., contact your organization's helpdesk, search the Internet for the sender organization's website or the topic mentioned in the email). Pay attention to the website addresses you click on, as well as those you enter yourself. Malicious website addresses often appear almost identical to legitimate sites, often using a slight variation in spelling or a different domain (e.g., .com instead of .net) . . . .
- **Open email attachments with caution**. Be wary of opening email attachments, even from senders you think you know, particularly when attachments are compressed files or ZIP files.
- **Keep your personal information safe**. Check a website's security to ensure the information you submit is encrypted before you provide it . . . .
- **Verify email senders**. If you are unsure whether or not an email is legitimate, try to verify the email's legitimacy by contacting the sender directly. Do not click on any links in the email. If possible, use a previous (legitimate) email to ensure the contact information you have for the sender is authentic before you contact them.
- **Inform yourself**. Keep yourself informed about recent cybersecurity threats and up to date on ransomware techniques. You can find information about known phishing attacks on the Anti-Phishing Working Group website. You may also want to sign up for CISA product notifications, which will alert you when a new Alert, Analysis Report, Bulletin, Current Activity, or Tip has been published.
- **Use and maintain preventative software programs**. Install antivirus software, firewalls, and

---

[15] How to Protect Your Networks from Ransomware 3–4, FBI, https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view (U.S. Government Interagency technical guidance document).

email filters—and keep them updated—to reduce malicious network traffic . . . .[16]

79. To prevent and detect cyber-attacks, including the cyber-attack that resulted in the Data Breach, Defendant could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

**Secure Internet-facing assets**
- Apply latest security updates
- Use threat and vulnerability management
- Perform regular audit; remove privileged credentials;

**Thoroughly investigate and remediate alerts**
- Prioritize and treat commodity malware infections as potential full compromise;

**Include IT Pros in security discussions**
- Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

**Build credential hygiene**
- Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords

**Apply principle of least-privilege**
- Monitor for adversarial activities
- Hunt for brute force attempts
- Monitor for cleanup of Event Logs
- Analyze logon events

**Harden infrastructure**
- Use Windows Defender Firewall
- Enable tamper protection
- Enable cloud-delivered protection
- Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office [Visual Basic for Applications].[17]

80. Given that Defendant was storing the Private Information of Plaintiff and Class Members, Defendant could and should have implemented all of the above measures to prevent and detect cyberattacks.

---

[16] *Protecting Against Ransomware*, CYBERSECURITY & INFRASTRUCTURE SEC. AGENCY (April 11, 2019), https://www.cisa.gov/news-events/news/protecting-against-ransomware.

[17] *Human-Operated Ransomware Attacks: A Preventable Disaster*, MICROSOFT THREAT INTELLIGENCE (Mar. 5, 2020), https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster.

81. Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

82. The foregoing frameworks are existing and applicable industry standards, and Defendant failed to comply with these accepted standards, thereby opening the door to and causing the Data Breach.

***The Data Breach Caused Plaintiff and the Class Members Injury and Damages***

83. Plaintiff and members of the proposed Class have suffered injury and damages from the unauthorized disclosure and misuse of their Private Information disclosed in the Data Breach that can be directly traced to Defendant, that has occurred, is ongoing, and/or will imminently occur.

84. Data breaches, such as the one experienced by Plaintiff and Class Members, are especially problematic because of the disruption they cause to the daily lives of victims affected by the attack.

85. As stated prior, on information and belief, in the Data Breach, cybercriminals were able to access the Plaintiff's and the proposed Class Members' Private Information, which is now being used or will imminently be used for fraudulent purposes and/or has been sold for such purposes and posted on the Dark Web for sale, causing widespread injury and damages.

86. Once an individual's Private Information is for sale and accessible on the dark web, cybercriminals are able to use the stolen and compromised information to gather and steal even more information.

87. The ramifications of Defendant's failure to keep Plaintiff's and the Class Members' Private Information secure are severe. Identity theft occurs when someone uses another's personal and financial information such as that person's name, account number, Social Security number, driver's license number, date of birth, medical information or other information, such as addresses, without permission, to commit fraud or other crimes.

88. Because Defendant failed to prevent the Data Breach, Plaintiff and the proposed Class Members have suffered, will imminently suffer, and will continue to suffer injury-in-fact and damages, including but not limited to:

a. The loss of the opportunity to control how Private Information is used;

b. Unauthorized use of stolen Private Information;

c. Dramatic increase in spam telephone calls;

d. Emotional distress;

e. The compromise and continuing publication of their Private Information;

f. Out-of-pocket expenses associated with the prevention, detection, recovery, and remediation from identity theft or fraud, and for necessary credit monitoring and identity theft protection;

g. Lost opportunity costs and lost wages associated with the time and effort expended addressing and trying to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft and fraud;

h. The diminution in value of their Private Information; and,

i. The continued risk to their Private Information, which remains in the possession of Defendant and is subject to further breaches so long as Defendant fails to undertake the appropriate measures to protect the Private Information in its possession.

***The Data Breach Caused Plaintiff and the Class an Increased Risk of Identity Theft***

89. Furthermore, the Data Breach has placed Plaintiff and the proposed Class Members at an increased risk of fraud and identity theft.

90. Plaintiff and Class Members are at a heightened risk of identity theft for years to come, especially because Defendant's failures resulted in Plaintiff's and Class Members' Private Information falling into the hands of identity thieves.

91. The unencrypted Private Information of Class Members has already or will end up for sale on the dark web because that is the modus operandi of hackers. Indeed, when these criminals do not post the data to the dark web, it is usually at least sold on private Telegram channels to even further identity thieves who purchase the Private Information for the express purpose of conducting financial fraud and identity theft operations.

92. The Private Information of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, Private Information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[18] Experian reports that a stolen credit or debit card number can sell for $5 to $110 on the dark web.[19] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[20]

93. Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts.

94. This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information…[is] worth more than 10x on the black market."[21]

95. Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

96. Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the cybercriminal to take on the victim's identity, or to track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

97. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity,

---

[18] Anita George, *Your Personal Data Is for Sale on the Dark Web. Here's How Much It Costs*, DIGITAL TRENDS (Oct. 16, 2019), https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs.

[19] Brian Stack, *Here's How Much Your Personal Information Is Selling for on the Dark Web*, EXPERIAN (Dec. 6, 2017), https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web.

[20] *For Sale in the Dark*, VPNOverview, https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark

[21] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10X Price of Stolen Credit Card Numbers*, (Feb. 6, 2015), https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.

such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data breaches are often the starting point for these additional targeted attacks on the victims.

98. Identity thieves can also use an individual's personal data and Private Information to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's information, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant issued in the victim's name.[22]

99. Further, the standard operating procedure for cybercriminals is to use some data, like the Private Information here, to access "Fullz packages" of that person to gain access to the full suite of additional Private Information that those cybercriminals have access to through other means. Using this technique, identity thieves piece together full pictures of victims' information to perpetrate even more types of attacks.

100. With "Fullz" packages, cybercriminals can cross-reference two sources of Private Information to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy to assemble complete dossiers on individuals.

101. The development of "Fullz" packages means here that the stolen Private Information from the Data Breach can easily be used to link and identify it to Plaintiff's and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the Private Information that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

[22] *Identity Theft and Your Social Security Number,* SOC. SEC. ADMIN., 1 (2018), https://www.ssa.gov/pubs/EN-05-10064.pdf.

102. Further, as discussed above, the standard operating procedure for cybercriminals is to use some data, like the Private Information here, to access Fullz packages of that person to gain access to the full suite of additional Private Information that those cybercriminals have access to through other means. Using this technique, identity thieves piece together full pictures of victims' information to perpetrate even more types of attacks.

103. There are myriad dangers which affect victims of identity theft, including: cybercriminals opening new financial accounts, credit cards, and loans in victims' names; victims losing health care benefits (medical identity theft); hackers taking over email and other accounts; time and effort to repair credit scores; losing home due to mortgage and deed fraud; theft of tax refunds; hackers posting embarrassing posts on victims' social media accounts; victims spending large amounts of time and money to recover their identities; experiencing psychological harm and emotional distress; victims becoming further victimized by repeat instances of identity theft and fraud; cybercriminals committing crimes in victims' names; victims' personal data circulating the Dark Web forever; victims receiving increased spam telephone calls and emails; victims' children or elderly parents having their identities stolen.

104. Individuals, like Plaintiff and Class Members, are particularly concerned with protecting the privacy of their Social Security numbers, which are the key to stealing any person's identity and is likened to accessing your DNA for hackers' purposes.

105. According to the Social Security Administration, each time an individual's Social Security number is compromised, "the potential for a thief to illegitimately gain access to bank accounts, credit cards, driving records, tax and employment histories and other private information increases."[23] Moreover, "[b]ecause many organizations still use SSNs as the primary identifier, exposure to identity theft and fraud remains."[24]

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number

---

[23] *See Avoid Identity Theft*, SOC. SEC. ADMIN., https://www.ssa.gov/phila/ProtectingSSNs.htm#:~:text=An%20organization's%20collection%20and%20use,and%20other%20private%20information%20increases

[24] *Id.*

> until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[25]

106. In fact, "[a] stolen Social Security number is one of the leading causes of identity theft and can threaten your financial health."[26] "Someone who has your SSN can use it to impersonate you, obtain credit and open bank accounts, apply for jobs, steal your tax refunds, get medical treatment, and steal your government benefits."[27]

107. Identity thieves may obtain a job using the victim's Social Security number, rent a house or receive medical services in the victim's name, and may even give the victim's Private Information to police during an arrest—resulting in an arrest warrant being issued in the victim's name. That can be even more problematic and difficult to remedy for someone who already has a criminal record.

108. Such fraud may go undetected until debt collection calls commence months, or even years later. Stolen Social Security numbers also make it possible for thieves to file fraudulent tax returns, file for unemployment benefits, or apply for a job using a false identity. Each of these fraudulent activities is difficult to detect. An individual may not know that his or her Social Security Number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

109. Data Breach victims suffer long-term consequences when their social security numbers are taken and used by hackers. Even if they know their social security numbers are being misused, Plaintiff and Class Members cannot obtain new numbers unless they become a victim of social security number misuse.

110. It is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In

---

[25] *Identity Theft and Your Social Security Number*, SOC. SEC. ADMIN. (Oct. 2024), https://www.ssa.gov/pubs/EN-05-10064.pdf.

[26] *See How to Protect Yourself from Social Security Number Identity Theft*, EQUIFAX, https://www.equifax.com/personal/education/identity-theft/articles/-/learn/social-security-number-identity-theft/

[27] *See* Julia Kagan, *What is an SSN? What to Know About Social Security Numbers*, INVESTOPEDIA (Sept. 2, 2024) https://www.investopedia.com/terms/s/ssn.asp.

other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

111. Even then, a new Social Security number may not be effective. According to Julie Ferguson of the Identity Theft Resource Center, "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[28]

112. Similarly, the Social Security Administration has warned that "a new number probably won't solve all your problems. This is because other governmental agencies (such as the IRS and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) will have records under your old number. Along with other personal information, credit reporting companies use the number to identify your credit record. So, using a new number won't guarantee you a fresh start. This is especially true if your other PII, such as your name and address, remains the same."[29]

113. Further, the California state government states that "[o]riginally, your Social Security number (SSN) was a way for the government to track your earnings and pay you retirement benefits. But over the years, it has become much more than that. It is the key to a lot of your personal information. With your name and SSN, an identity thief could open new credit and bank accounts, rent an apartment, or even get a job."[30]

114. The FTC recommends that identity theft victims take several costly steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for 7 years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, seeking a credit freeze, and correcting their credit reports.[31]

---

[28] Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millionsworrying-about-identity-theft.

[29] *Identity Theft and Your Social Security Number*, Pub. No. 05-10064, SOCIAL SEC. ADMIN. (July 2021), https://www.ssa.gov/pubs/EN-05-10064.pdf.

[30] *See Your Social Security Number: Controlling the Key to Identity Theft*, CAL. DEPT. JUST. https://oag.ca.gov/idtheft/facts/your-ssn

[31] *What To Do Right Away*, FTC (2024), https://www.identitytheft.gov/Steps.

115. Further, according to the Identity Theft Resource Center's 2021 Consumer Aftermath Report, identity theft victims suffer "staggering" emotional tolls. For example, nearly 30% of victims have been the victim of a previous identity crime; an all-time high number of victims say they have contemplated suicide. Moreover, thirty-three percent reported not having enough money to pay for food and utilities, while 14% were evicted because they couldn't pay rent or their mortgage. Fifty-four percent reported feelings of being violated.[32]

116. What's more, theft of Private Information is also gravely serious outside of the traditional risks of identity theft. In the last two decades, as more and more of our lives become interconnected through the lens of massively complex cloud computing, Private Information are valuable property rights.

117. Private Information are such valuable commodities to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black-market" for years.

118. Where the most Private Information belonging to Plaintiff and Class Members was accessible from Defendant's network, there is a strong probability that entire batches of stolen information have been dumped on the black market and are yet to be dumped on the black market, meaning Plaintiff and the Class Members are at an increased risk of fraud and identity theft for many years into the future.

119. Further, there may be a substantial time lag—measured in years—between when harm occurs versus when it is discovered, and between when Private Information and/or financial information is stolen and when it is used. According to the U.S. Government Accountability Office, which studied data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data has been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[33]

---

[32] *The Identity Theft Resource Center's 2021 Consumer Aftermath Report Reveals Impacts on Covid-19 Identity Crime Victims*, IDENTITY THEFT RES. CTR. (May, 26, 2021), https://www.idtheftcenter.org/post/the-identity-theft-resource-centers-2021-consumer-aftermath-report-reveals-impacts-on-covid-19-identity-crime-victims/.

[33] *See* GAO Report, at p. 29.

120. Thus, Plaintiff and the Class Members must vigilantly monitor their financial and credit accounts for many years to come.

121. Accordingly, the Data Breach has caused Plaintiff and the proposed Class Members a greatly increased risk of identity theft and fraud, in addition to the other injuries and damages set forth herein.

122. Defendant knew or should have known of these harms which would be caused by the Data Breach they permitted to occur and strengthened its data systems accordingly.

***Loss of Time to Mitigate Risk of Identity Theft and Fraud***

123. Because of the recognized risk of identity theft, when a data breach occurs, and an individual is notified by a company that their Private Information was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft or fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm and Defendant arguing that the individual failed to mitigate damages.

124. The need to spend time mitigating the risk of harm is especially important in cases like this where Plaintiff's and Class Members' Social Security numbers or other government identification are affected.

125. By spending this time, Plaintiff was not manufacturing his own harm, he was taking necessary steps because the Data Breach included his Social Security number.

126. Plaintiff and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions to remedy the harms they have or may experience because of the Data Breach, such as contacting credit bureaus to place freezes on their accounts; changing passwords and re-securing their own computer networks; and checking their financial accounts for any indication of fraudulent activity, which may take years to detect.

127. These efforts are consistent with the U.S. Government Accountability Office that released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to her good name and credit record."[34]

***Diminution in Value of Private Information***

128. PII is a valuable property right.[35] Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk-to-reward analysis illustrates beyond doubt that Private Information has considerable market value.

129. An active and robust legitimate marketplace for Private Information exists. In 2019, the data brokering industry was worth roughly $200 billion.[36]

130. In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[37]

131. Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $60.00 a year.[38]

132. Conversely, sensitive PII can sell for as much as $363 per record on the dark web according to the Infosec Institute.[39]

133. As a result of the Data Breach, Plaintiff's and Class Members' Private Information, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by

[34] See GAO-07-737, *Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, U.S. GOV'T OFFICE, (June 2007), https://www.gao.gov/new.items/d07737.pdf.

[35] *See, e.g.*, Randall T. Soma et al, *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("Private Information") Equals the "Value" of Financial Assets*, 15 RICH. J.L. & TECH. 11, at *3-4 (2009) ("Private Information, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

[36] David Lazarus, *Shadowy Data Brokers Make the Most of Their Invisibility Cloak*, L.A. TIMES (Nov. 5, 2019), https://www.latimes.com/business/story/2019-11-05/column-data-brokers.

[37] *See e.g.*, https://datacoup.com/ (last visited Apr. 10, 2026).

[38] *Frequently Asked Questions*, NIELSON COMPUT. & MOBIL PANEL, https://computermobilepanel.nielsen.com/ui/US/en/faqen.html

[39] *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/.

its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss. Moreover, Private Information is now readily available, and the rarity of the Data has been lost, thereby causing additional loss of value.

***The Future Cost of Credit and Identity Theft Monitoring Is Reasonable and Necessary***

134. Based on the value of the information stolen, the data either has or will be sold to cybercriminals whose mission is to perpetrate identity theft and fraud. Even if the data is not posted online, these data are ordinarily sold and transferred through private Telegram channels wherein thousands of cybercriminals participate in a market for such data so that they can misuse it and earn money from financial fraud and identity theft of data breach victims.

135. Such fraud may go undetected for years; consequently, Plaintiff and Class Members are at a present and continuous risk of fraud and identity theft for many years into the future.

136. The retail cost of credit monitoring and identity theft monitoring can cost $200 or more per year per Class Member. This is a reasonable and necessary cost to monitor and protect Class Members from the risk of identity theft that arose from the Data Breach. This is a future cost for a minimum of seven years that Plaintiff and Class Members would not need to bear but for Defendant's failure to safeguard their Private Information.

***Lost Benefit of the Bargain***

137. Furthermore, Defendant's poor data security deprived Plaintiff and Class Members of the benefit of their bargain. When agreeing to provide Defendant with their Private Information under certain terms, Plaintiff and Class Members understood and expected that Defendant would properly safeguard and protect their Private Information, when in fact, Defendant did not provide the expected data security. Accordingly, Plaintiff and Class Members received services and/or employment of a lesser value than what they reasonably expected to receive under the bargains they struck with Defendant.

***<u>Plaintiff's Experiences</u>***

138. Plaintiff is a former employee of Defendant and, upon information and belief, is a data breach victim.

139. As a condition of employment with Defendant, Plaintiff provided Defendant with his Private Information, which was used in connection with Plaintiff's employment.

140. Defendant deprived Plaintiff of the earliest opportunity to guard himself against the Data Breach's effects by failing to promptly notify him.

141. As a result of its inadequate cybersecurity, upon information and belief, Defendant exposed Plaintiff's Private Information for theft by cybercriminals and sale on the dark web.

142. As a result of the Data Breach, Plaintiff spent time dealing with the consequences of the Data Breach, which includes self-monitoring his accounts and credit reports to ensure no fraudulent activity has occurred. This time has been lost forever and cannot be recaptured.

143. Plaintiff has and will spend considerable time and effort monitoring his accounts to protect himself from additional identity theft. Plaintiff fears for his personal financial security and uncertainty over what Sensitive Information was exposed in the Data Breach.

144. As a result of the Data Breach, Plaintiff has experienced an uptick in spam text messages and calls, evidencing misuse of his Private Information.

145. Plaintiff has and is experiencing feelings of anxiety, stress, fear, and frustration because of the Data Breach. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that the law contemplates and addresses.

146. Plaintiff has suffered actual injury in the form of damages to and diminution in the value of his Sensitive Information—a form of intangible property that Plaintiff entrusted to Defendant, which was compromised in and as a result of the Data Breach.

147. Plaintiff suffered actual injury from the exposure of his Private Information—which violates his rights to privacy.

148. Plaintiff has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from his Private Information being placed in the hands of unauthorized third parties and possibly criminals.

149. Once an individual's Private Information is for sale and accessible on the dark web, as, upon information and belief, Plaintiff's Private Information is here as a result of the Data Breach,

cybercriminals are able to use the stolen and compromised information to gather and steal even more information.[40] On information and belief, Plaintiff's name and Social Security number were compromised as a result of the Data Breach.

150. Plaintiff has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected, and safeguarded from future breaches.

## CLASS ACTION ALLEGATIONS

151. Plaintiff brings this action, pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure on behalf of the following classes defined as:

> **Nationwide Class**: All individuals residing in the United States whose Private Information was compromised in the Data Breach (the "Nationwide Class", and the individuals in the Class, the "Class Members").
>
> **California Subclass**
> All individuals residing in the State of California whose Private Information was compromised in the Data Breach (the "California Subclass").

152. Collectively, the Nationwide Class and the California Subclass are referred to as the "Classes".

153. Excluded from the Classes are Defendant's officers and directors; any entity in which Defendant has a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendant. Excluded also from the Classes are members of the judiciary to whom this case is assigned, their families and members of their staff.

154. Plaintiff reserves the right to amend the definitions of the Classes or add a class if further information and discovery indicates that the definitions of the Classes should be narrowed, expanded, or otherwise modified.

---

[40] *What do Hackers Do with Stolen Information?*, AURA (Sept. 5, 2023), https://www.aura.com/learn/what-do-hackers-do-with-stolen-information.

155. Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

156. Numerosity. The members of the Classes are so numerous that joinder of all of them is impracticable. While the exact number of Class Members is unknown to Plaintiff at this time, based on information and belief, the Class consists of thousands whose data was compromised in the cyber-attack and Data Breach.

157. Commonality. There are questions of law and fact common to the Classes, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a) Whether Defendant unlawfully used, maintained, lost, or disclosed Plaintiff's and Class Members' Private Information;

b) Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the cyber-attack;

c) Whether Defendant's data security systems prior to and during the cyber-attack complied with applicable data security laws and regulations;

d) Whether Defendant's data security systems prior to and during the cyber-attack were consistent with industry standards;

e) Whether Defendant owed a duty to Class Members to safeguard their Private Information;

f) Whether Defendant breached their duty to Class Members to safeguard their Private Information;

g) Whether computer hackers obtained Class Members' Private Information in the cyber-attack;

h) Whether Defendant knew or should have known that their data security systems and monitoring processes were deficient;

i) Whether Plaintiff and Class Members suffered legally cognizable damages as a result of Defendant's misconduct;

j) Whether Defendant owed a duty to provide Plaintiff and Class Members notice of this data breach, and whether Defendant breached that duty;

k) Whether Defendant's conduct was negligent;

l) Whether Defendant's acts, inactions, and practices complained of herein amount to an invasion of privacy;

m) Whether Defendant's actions violated federal law; and

n) Whether Plaintiff and Class Members are entitled to damages, civil penalties, and/or injunctive relief.

158. Typicality. Plaintiff's claims are typical of those of other Class Members because Plaintiff's information, like that of every other Class Member, was compromised in the Data Breach.

159. Adequacy of Representation. Plaintiff will fairly and adequately represent and protect the interests of the members of the Classes. Plaintiff's Counsel are competent and experienced in litigating class actions.

160. Predominance. Defendant has engaged in a common course of conduct toward Plaintiff and Class Members, in that all the Plaintiff's and Class Members' data was stored on the same computer systems and unlawfully accessed in the same way. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

161. Superiority. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to

multiple individual actions or piecemeal litigation. Absent a class action, most class members would likely find that the cost of litigating their individual claim is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each class member.

162. Defendant has acted on grounds that apply generally to the Classes as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class-wide basis.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE and NEGLIGENCE *PER SE*
### (On Behalf of Plaintiff and the Nationwide Class)

163. Plaintiff re-alleges and incorporates by reference all preceding allegations in paragraphs 1 through 162 as if fully set forth herein.

164. Defendant knowingly collected, came into possession of, and maintained Plaintiff's and Class Members' Private Information, and had a duty to exercise reasonable care in safeguarding, securing, and protecting such information from being compromised, lost, stolen, misused, and/or disclosed to unauthorized parties.

165. Defendant owed a duty to Plaintiff and Class Members to create and implement reasonable data security practices and procedures to protect the Private information in its possession, including adequately training employees and others who accessed Private Information within computer systems on how to adequately protect Private Information.

166. Defendant has a duty to have procedures in place to detect and prevent the loss or unauthorized dissemination of Plaintiff's and Class Members' Private Information.

167. Defendant owed a duty to Plaintiff and Class Members to act upon data security warnings and alerts in a timely fashion.

168. Defendant had, and continues to have, a duty to timely disclose that Plaintiff's and Class Members' Private Information within their possession was compromised and precisely the types of information that were compromised.

169. Defendant owes a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards, applicable standards of care from statutory authority like Section 5 of the FTC Act and other requirements discussed herein, and to ensure that their systems and networks, and the personnel responsible for them, adequately protected individuals' Private Information.

170. Defendant's duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendant and Plaintiff and Class Members. Defendant is in a position to ensure that its systems are sufficient to protect against the foreseeable risk of harm to Plaintiff and Class Members from a data breach.

171. Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential Private Information.

172. Defendant has a common law duty to prevent foreseeable harm to others. This duty existed because Plaintiff and Class Members were the foreseeable and probable victims of any inadequate security practices on the part of Defendant. By collecting and storing valuable Private Information that is routinely targeted by criminals for unauthorized access, Defendant is obligated to act with reasonable care to protect against these foreseeable threats.

173. Defendant breached these duties by failing to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' Private Information.

174. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

a. Failing to adopt, implement, and maintain adequate security measures to safeguard Plaintiff's and Class Members' Private Information;

b. Failing to adequately monitor the security of their networks and systems and to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of consumer information; and

c. Failing to periodically ensure that its computer systems and networks had plans in place to maintain reasonable data security safeguards.

d. Failing to detect the breach at the time it began or within a reasonable time thereafter; and

e. Failing to follow their own privacy policies and practices published to their employees and residents.

175. Further, Defendant's violation of federal statutes and other applicable laws also constitutes negligence *per se*. Specifically, as described herein, Defendant violated the FTC Act.

176. Section 5 of the FTC Act, 15 U.S.C. 45, prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by Defendant of failing to use reasonable measures to protect Plaintiff's and Class Members' Private Information. Various FTC publications and orders also form the basis of Defendant's standard of care.

177. Defendant violated Section 5 of the FTC Act (and similar state statutes) by failing to use reasonable measures to protect Plaintiff's and Class Members' Private Information and by failing to comply with industry standards.

178. Defendant's conduct was particularly unreasonable given the nature and amount of Private Information obtained and stored and the foreseeable consequences of a data breach on Defendant's systems.

179. Moreover, the harm that has occurred is the type of harm the FTC Act (and similar state statutes) was intended to guard against. Indeed, the FTC has pursued over fifty enforcement actions against

businesses which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm suffered by Plaintiff and Class Members.

180. Defendant, through its actions and/or omissions, unlawfully breached its duties to Plaintiff and Class Members by failing to exercise reasonable care in protecting and safeguarding Plaintiff's and Class Members' Private Information within Defendant's possession.

181. Defendant, through its actions and/or omissions, unlawfully breached its duties to Plaintiff and Class Members by failing to have appropriate procedures in place to detect and prevent the dissemination of Plaintiff's and Class Members' Private Information.

182. Defendant, through its actions and/or omissions, unlawfully breached its duty to timely disclose to Plaintiff and Class Members that the Private Information within Defendant's possession might have been compromised and precisely the type of information compromised.

183. It was foreseeable that Defendant's failure to use reasonable measures to protect Plaintiff's and Class Members' Private Information would result in injury to Plaintiff and Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches.

184. It was foreseeable that the failure to adequately safeguard Plaintiff's and Class Members' Private Information would result in injuries to Plaintiff and Class Members.

185. Defendant's breach of duties owed to Plaintiff and Class Members caused Plaintiff's and Class Members' Private Information to be compromised.

186. But for Defendant's negligent conduct and breach of the above-described duties owed to Plaintiff and Class Members, their Private Information would not have been compromised.

187. As a result of Defendant's failure to timely notify Plaintiff and Class Members that their Private Information had been compromised, Plaintiff and Class Members are unable to take the necessary precautions to mitigate damages by preventing future fraud.

188. As a result of Defendant's negligence and negligence *per se*, Plaintiff and Class Members are in danger of imminent harm in that their Private Information, which is still in the possession of third parties, will be used for fraudulent purposes, and Plaintiff and Class Members have and will suffer damages including: a substantial increase in the likelihood of identity theft; the compromise, publication, and theft of their personal information; loss of time and costs associated with the prevention, detection, and recovery from unauthorized use of their personal information; the continued risk to their personal information; future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the personal information compromised as a result of the Data Breach; anxiety, stress, sleep disruption, fear, and frustration arising from loss of privacy; and overpayment for the services or products that were received without adequate data security.

**COUNT II**
**BREACH OF IMPLIED CONTRACT**
**(On Behalf of Plaintiff and the Nationwide Class)**

189. Plaintiff re-alleges and incorporates by reference all preceding allegations in paragraphs 1 through 162 as if fully set forth herein.

190. Plaintiff and the Class were required to deliver their Private Information to Defendant as part of the process of obtaining services provided by Defendant.

191. Defendant solicited, offered, and invited Plaintiff and Class members to provide their Private Information as part of Defendant's regular business practices. Plaintiff and Class Members accepted Defendant's offer and provided their Private Information to Defendant.

192. Plaintiff and Class Members entered into implied contracts with Defendant under which Defendant agreed to safeguard and protect such information and to timely and accurately notify Plaintiff and Class Members if and when their data had been breached and compromised. Each such contractual relationship imposed on Defendant an implied covenant of good faith and fair dealing by which Defendant was required to perform its obligations and manage Plaintiff's and Class Members' data in a manner which comported with the reasonable expectations of privacy and protection attendant to entrusting such data to Defendant.

193. In providing their Private Information, Plaintiff and Class Members entered into an implied contract with Defendant. Pursuant to these implied contracts, Plaintiff and the Nationwide Class understood that Defendant, in receiving such data, (1) provide services to Plaintiff and Class Members, (2) take reasonable measures to safeguard Plaintiff's and the other Class Members' Private Information, (3) provide prompt and adequate notice of all unauthorized access and/or theft of their Private Information, and (4) protect Plaintiff's and Class Members' Private Information in compliance with federal and state laws and regulations and industry standards.

194. In delivering their Private Information to Defendant, Plaintiff and Class Members intended and understood that Defendant would adequately safeguard that data.

195. Plaintiff and the Class Members would not have entrusted their Private Information to Defendant in the absence of such an implied contract.

196. Plaintiff and Class Members reasonably understood that a portion of the payment they provided to Defendant would be used to pay for adequate security measures.

197. Defendant accepted possession of Plaintiff's and Class Members' Private Information.

198. Had Defendant disclosed to Plaintiff and Class Members that Defendant did not have adequate computer systems and security practices to secure employee and customer Private Information, Plaintiff and members of the Class would not have provided their Private Information to Defendant.

199. Defendant recognized that Plaintiff's and Class Members' Private Information is highly sensitive and must be protected, and that this protection was of material importance as part of the bargain to Plaintiff and Class Members.

200. Plaintiff and Class Members fully performed their obligations under the implied contracts with Defendant.

201. Defendant breached the implied contract with Plaintiff and Class Members by failing to take reasonable measures to safeguard its data.

202. Defendant breached the implied contract with Plaintiff and Class Members by failing to promptly notify them of the access to and exfiltration of their Private Information.

203. As a direct and proximate result of the breach of the contractual duties, Plaintiff and Class Members have suffered actual, concrete, and imminent injuries. The injuries suffered by Plaintiff and the Class Members include: (a) the invasion of privacy; (b) the compromise, disclosure, theft, and unauthorized use of Plaintiff's and Class Members' Private Information; (c) economic costs associated with the time spent to detect and prevent identity theft, including loss of productivity; (d) monetary costs associated with the detection and prevention of identity theft; (e) economic costs, including time and money, related to incidents of actual identity theft; (f) the emotional distress, fear, anxiety, nuisance and annoyance of dealing related to the theft and compromise of their Private Information; (g) the diminution in the value of the services bargained for as Plaintiff and Class Members were deprived of the data protection and security that Defendant promised when Plaintiff and the proposed class entrusted Defendant with their Private Information; and (h) the continued and substantial risk to Plaintiff's and Class Members' Private Information, which remains in the Defendant's possession with inadequate measures to protect Plaintiff's and Class Members' Private Information.

## COUNT III
## UNJUST ENRICHMENT
## (On Behalf of Plaintiff and the Nationwide Class)

204. Plaintiff re-alleges and incorporates by reference all preceding allegations in paragraphs 1 through 162 as if fully set forth herein.

205. Upon information and belief, Defendant funds their data security measures entirely from its general revenues, including from payments made by and/or on behalf of Plaintiff and Class Members, in exchange for services, for which Defendant collected and maintained Plaintiff's and Class Members' Private Information.

206. As such, Plaintiff and Class Members conferred a monetary benefit on Defendant by providing Defendant with their valuable Private Information as a portion of value and monies derived from Plaintiff and Class Members is to be used to provide a reasonable level of data security, and the amount of the portion of each made that is allocated to data security is known to Defendant.

207. Defendant enriched itself by saving the costs they reasonably should have expended on data security measures to secure Plaintiff's and Class Members' Private Information.

208. Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendant instead calculated to avoid its data security obligations at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's failure to provide the requisite security.

209. Under the principles of equity and good conscience, Defendant should not be permitted to retain the monetary value of the benefit belonging to Plaintiff and Class Members, because Defendant failed to implement appropriate data management and security measures that are mandated by industry standards.

210. Defendant acquired the monetary benefit and Private Information through inequitable means in that they failed to disclose the inadequate security practices previously alleged.

211. If Plaintiff and Class Members knew that Defendant had not secured their Private Information, they would not have agreed to provide their Private Information to Defendant.

212. Plaintiff and Class Members have no adequate remedy at law.

213. As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity to control how their Private Information is used; (iii) the compromise, publication, and/or theft of their Private Information; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Private Information; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (vi) the continued risk to their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect Private Information in its continued possession; and (vii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Private Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiff and Class Member

214. As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

215. Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds they unjustly received from them.

## COUNT IV
## INVASION OF PRIVACY—INTRUSION UPON SECLUSION AND PUBLIC DISCLOSURE OF PRIVATE FACTS
**(On Behalf of Plaintiff and the Nationwide Class)**

216. Plaintiff re-alleges and incorporates by reference all preceding allegations in paragraphs 1 through 162 as if fully set forth herein.

217. Plaintiff and the Nationwide Class had a legitimate expectation of privacy regarding their highly sensitive and confidential Private Information and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties.

218. Plaintiff and Class Members successfully took reasonable and appropriate steps to keep their Private Information confidential from the public.

219. Defendant owed a duty to Plaintiff and the Nationwide Class to keep their Private Information confidential.

220. The unauthorized acquisition (i.e., theft) by a third party of Plaintiff's and Class Members' Private Information is highly offensive to a reasonable person.

221. The intrusion was into a place or thing which was private and entitled to be private. Plaintiff and the Nationwide Class disclosed their sensitive and confidential information to Defendant in order to receive services, but they did so privately, with the intention that their information would be kept confidential and protected from unauthorized disclosure. Plaintiff and the Nationwide Class were reasonable in their belief that such information would be kept private and would not be disclosed without their authorization.

222. Defendant's conduct also represents a public disclosure of private facts in that the disclosure was made to cybercriminals—individuals in a special relationship with Plaintiff and the proposed Nationwide Class in that they are the exact group from whom the expected cybersecurity measures are intended to protect Plaintiff and the proposed Class.

223. The Data Breach constitutes an intentional interference with Plaintiff's and the Nationwide Class's interest in solitude or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

224. Defendant acted with a knowing state of mind when it permitted the Data Breach because it knew its information security practices were inadequate.

225. Defendant acted with a knowing state of mind when it failed to notify Plaintiff and the Nationwide Class in a timely fashion about the Data Breach, thereby materially impairing their mitigation efforts.

226. By intentionally failing to keep Plaintiff's and Class Members' Private Information safe, and by intentionally misusing and/or disclosing said information to unauthorized parties for unauthorized use, Defendant intentionally invaded Plaintiff's and Class Members' privacy by:

a. Intentionally and substantially intruding into Plaintiff's and Class Members' private affairs in a manner that identifies Plaintiff and Class Members and that would be highly offensive and objectionable to an ordinary person;

b. Intentionally publicizing private facts about Plaintiff and Class Members, which is highly offensive and objectionable to an ordinary person; and

c. Intentionally causing anguish or suffering to Plaintiff and Class Members.

227. As the Restatement explains, as used throughout the Restatement of Torts, intent "has reference to the consequences of an act rather than the act itself." Restatement (Second) of Torts § 8A, cmt. A (1964). "Intent is not, however, limited to consequences which are desired. If the actor knows that the consequences are certain, or substantially certain, to result from her act, and still goes ahead, she is treated by the law as if she had in fact desired to produce the result." *Id.* cmt. B.

228. Indeed, given the foreseeability of the harms inherent in data breaches and the ubiquitous nature of data breaches, Defendant was substantially certain that its failure to implement reasonable cybersecurity standards would lead to an invasion of Plaintiff's privacy.

229. Acting with knowledge, Defendant had notice and knew that its inadequate cybersecurity practices would cause injury to Plaintiff and the Nationwide Class.

230. As a proximate result of Defendant's acts and omissions, the Private Information of Plaintiff and the Nationwide Class was stolen by a third party and is now available for disclosure and redisclosure without authorization, causing Plaintiff and the Nationwide Class to suffer damages.

231. Unless and until enjoined and restrained by order of this Court, Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiff and the Nationwide Class because their Private Information is still maintained by Defendant with its inadequate cybersecurity system and policies.

232. Plaintiff and the Nationwide Class have no adequate remedy at law for the injuries relating to Defendant's continued possession of their sensitive and confidential records. A judgment for monetary damages will not end Defendant's inability to safeguard the Private Information of Plaintiff and the Nationwide Class.

233. In addition to injunctive relief, Plaintiff, on behalf of himself and the other members of the Nationwide Class, also seeks compensatory damages for Defendant's invasion of privacy, which includes the value of the privacy interest invaded by Defendant, the costs of future monitoring of their credit history for identity theft and fraud, plus prejudgment interest and costs.

## COUNT V
## VIOLATION OF THE NEVADA CONSUMER FRAUD ACT
## Nev. Rev. Stat. § 41.600
## (On Behalf of Plaintiff and the Nationwide Class)

234. Plaintiff re-alleges and incorporates by reference all preceding allegations in paragraphs 1 through 162 as if fully set forth herein.

235. NRS § 41.600 provides that "[a]n action may be brought by any person who is a victim of consumer fraud."

236. Defendant violated NRS § 41.600 and committed a deceptive trade practice under NRS § 598.0923(1)(b) and NRS § 598.0923(1)(c) by *inter alia*:

a. knowingly failing to implement and maintain reasonable security and privacy measures to protect Plaintiff's and Class Members' Private Information, which was a direct and proximate cause of the Data Breach;

b. knowingly failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures following previous cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

c. knowingly failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Class Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45, and other state data security statutes, which was a direct and proximate cause of the Data Breach;

d. knowingly omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiff's and Class Members' Private Information; and

e. knowingly omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Class Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45 and other state data security statutes.

237. Additionally, Defendant violated NRS § 603A.210(1) which mandates that "[a] data collector that maintains records which contain personal information of a resident of this State shall implement and maintain reasonable security measures to protect those records from unauthorized access, acquisition, destruction, use, modification or disclosure."

238. Additionally, Defendant violated NRS § 603A.220(1) which mandates that "[a]ny data collector that maintains computerized data which includes personal information that the data collector does not own shall notify the owner or licensee of the information of any breach of the security of the system data immediately following discovery if the personal information was, or is reasonably believed to have been, acquired by an unauthorized person."

239. Defendant's omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendant's data security and ability to protect the confidentiality of their Private Information.

240. Defendant intended to mislead Plaintiff and Class Members and induce them to rely on their omissions.

241. Had Defendant disclosed to Plaintiff and Class Members that their data systems were not secure—and thus vulnerable to attack—Defendant would have been unable to continue in business and they would have been forced to adopt reasonable data security measures and comply with the law. Defendant accepted the Private Information that Plaintiff and Class Members entrusted to them while keeping the inadequate state of their security controls secret from the public. Accordingly, Plaintiff and Class Members acted reasonably in relying on Defendant's omissions, the truth of which they could not have discovered through reasonable investigation.

242. Defendant acted intentionally, knowingly, maliciously, and recklessly disregarded Plaintiff's and Class Members' rights.

243. As a direct and proximate result of Defendant's unfair and deceptive acts and practices, Plaintiff and Class Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from fraud and identity theft; time and expenses related to monitoring their financial accounts for fraudulent activity; an increased, imminent risk of fraud and identity theft; and loss of value of their Private Information.

244. And, on information and belief, Plaintiff's Private Information has already been published—or will be published imminently—by cybercriminals on the Dark Web.

245. Plaintiff and Class Members seek all monetary and non-monetary relief allowed by law.

## COUNT VI
**Violation of the California Unfair Competition Law,**
**Cal. Bus. & Prof. Code §17200 *et seq.***
**(On Behalf of Plaintiff and California Subclass)**

246. Plaintiff re-alleges and incorporates by reference all preceding allegations in paragraphs 1 through 162 as if fully set forth herein.

247. Plaintiff brings this count on behalf of the California Subclass. For purposes of this count, Plaintiff will refer to the California Subclass as the "Class".

248. Defendant is a "person" defined by Cal. Bus. & Prof. Code § 17201.

249. Defendant violated Cal. Bus. & Prof. Code § 17200 et seq. ("UCL") by engaging in unlawful, unfair, and deceptive business acts and practices.

250. Defendant's "unfair" acts and practices include:

a. by utilizing cheaper, ineffective security measures and diverting those funds to its own profit, instead of providing a reasonable level of security that would have prevented the hacking incident;

b. failing to follow industry standard and the applicable, required, and appropriate protocols, policies, and procedures regarding the encryption of data;

c. failing to timely and adequately notify Class Members about the Data Breach's occurrence and scope, so that they could take appropriate steps to mitigate the potential for identity theft and other damages;

d. Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiff's and Class Members' personal information; and

e. Omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Class Members' personal information.

251. Defendant has engaged in "unlawful" business practices by violating multiple laws, including the FTC Act, 15 U.S.C. § 45, and California common law.

252. Defendant's unlawful, unfair, and deceptive acts and practices include:

a. Failing to implement and maintain reasonable security and privacy measures to protect Plaintiff's and Class Members' personal information, which was a direct and proximate cause of the Data Breach;

b. Failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, which was a direct and proximate cause of the Data Breach;

c. Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Class Members' personal information, including duties imposed

by the FTC Act, and 15 U.S.C. § 45, which was a direct and proximate cause of the Data Breach;

d. Misrepresenting that it would protect the privacy and confidentiality of Plaintiff's and Class Members' personal information, including by implementing and maintaining reasonable security measures; and

e. Misrepresenting that it would comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Class Members' personal information, including duties imposed by the FTC Act, and 15 U.S.C. § 45.

253. Defendant's representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendant's data security and ability to protect the confidentiality of consumers' personal information.

254. As a direct and proximate result of Defendant's unfair, unlawful, and fraudulent acts and practices, Plaintiff and Class Members' were injured and lost money or property, which would not have occurred but for the unfair and deceptive acts, practices, and omissions alleged herein, time and expenses related to monitoring their financial accounts for fraudulent activity, an increased, imminent risk of fraud and identity theft, and loss of value of their personal information.

255. Defendant's violations were, and are, willful, deceptive, unfair, and unconscionable.

256. Plaintiff and Class Members have lost money and property as a result of Defendant's conduct in violation of the UCL, as stated herein and above.

257. By deceptively storing, collecting, and disclosing their personal information, Defendant has taken money or property from Plaintiff and Class Members.

258. Defendant acted intentionally, knowingly, and maliciously to violate California's Unfair Competition Law, and recklessly disregarded Plaintiff's and Class Members' rights.

259. Plaintiff and Class Members seek all monetary and nonmonetary relief allowed by law, including restitution of all profits stemming from Defendant's unfair, unlawful, and fraudulent business practices or use of their personal information; declaratory relief; reasonable attorneys' fees and costs under

California Code of Civil Procedure § 1021.5; injunctive relief; and other appropriate equitable relief, including public injunctive relief.

**COUNT VII**
**Violation Of The California Consumer Privacy Act,**
**Cal. Civ. Code §§ 1798.100 *et seq.*, § 1798.150(a)**
**(On Behalf of Plaintiff and the California Subclass)**

260. Plaintiff re-alleges and incorporates by reference all preceding allegations in paragraphs 1 through 162 as if fully set forth herein.

261. Plaintiff brings this count on behalf of the California Subclass. For purposes of this count, Plaintiff will refer to the California Subclass as the "Class".

262. The California Consumer Privacy Act ("CCPA"), Cal. Civ. Code § 1798.150(a), creates a private cause of action for violations of the CCPA. Section 1798.150(a) specifically provides:

> Any consumer whose nonencrypted and nonredacted personal information, as defined in subparagraph (A) of paragraph (1) of subdivision (d) of Section 1798.81.5, is subject to an unauthorized access and exfiltration, theft, or disclosure as a result of the business's violation of the duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the personal information may institute a civil action for any of the following:
>
> (A) To recover damages in an amount not less than one hundred dollars ($100) and not greater than seven hundred and fifty ($750) per consumer per incident or actual damages, whichever is greater.
>
> (B) Injunctive or declaratory relief.
>
> (C) Any other relief the court deems proper.

263. Defendant is a "business" under § 1798.140(b) in that it is a corporation organized for profit or financial benefit of its shareholders or other owners, with gross revenue in excess of $25 million.

264. Plaintiff and Class Members are covered "consumers" under § 1798.140(g) in that they are natural persons who are California residents.

265. The personal information of Plaintiff and the Class Members at issue in this lawsuit constitutes "personal information" under § 1798.150(a) and 1798.81.5, in that the personal information Defendant collects and which was impacted by the cybersecurity attack includes an individual's first name or first initial and the individual's last name in combination with one or more of the following data elements, with either the name or the data elements not encrypted or redacted: (i) Social Security number;

(ii) Driver's license number, California identification card number, tax identification number, passport number, military identification number, or other unique identification number issued on a government document commonly used to verify the identity of a specific individual; (iii) account number or credit or debit card number, in combination with any required security code, access code, or password that would permit access to an individual's financial account; (iv) medical information; (v) health insurance information; (vi) unique biometric data generated from measurements or technical analysis of human body characteristics, such as a fingerprint, retina, or iris image, used to authenticate a specific individual.

266. Defendant knew or should have known that its computer systems and data security practices were inadequate to safeguard the Class Members' personal information and that the risk of a data breach or theft was highly likely. Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the personal information of Plaintiff and the Class Members. Specifically, Defendant subjected Plaintiff's and the Class Members' nonencrypted and nonredacted personal information to an unauthorized access and exfiltration, theft, or disclosure as a result of the Defendant's violation of the duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information, as described herein.

267. As a direct and proximate result of Defendant's violation of its duty, the unauthorized access and exfiltration, theft, or disclosure of Plaintiff's and Class Members' personal information included exfiltration, theft, or disclosure through Defendant's servers, systems, and website, and/or the dark web, where hackers further disclosed the personal identifying information alleged herein.

268. As a direct and proximate result of Defendant's acts, Plaintiff and the Class Members were injured and lost money or property, including but not limited to the loss of Plaintiff's and Class Members' legally protected interest in the confidentiality and privacy of their personal information, stress, fear, and anxiety, nominal damages, and additional losses described above.

269. Section 1798.150(b) specifically provides that "[n]o [prefiling] notice shall be required prior to an individual consumer initiating an action solely for actual pecuniary damages."

270. On June 4, 2026, pursuant to California Civil Code § 1798.150(b), Plaintiff mailed a CCPA notice letter to Defendant's registered service agents, detailing the specific provisions of the CCPA that

Defendant has violated and continues to violate. If Defendant cannot cure within 30 days—and Plaintiff believes such cure is not possible under these facts and circumstances—then Plaintiff intends to promptly amend this Complaint to seek statutory damages as permitted by the CCPA.

271. Accordingly, Plaintiff and the Class Members by way of this complaint seek actual pecuniary damages suffered as a result of Defendant's violations described herein.

**COUNT VIII**
**VIOLATION OF THE CALIFORNIA CONSUMER RECORDS ACT**
**(On Behalf of Plaintiff and California Subclass)**

272. Plaintiff re-alleges and incorporates by reference all preceding allegations in paragraphs 1 through 162 as if fully set forth herein.

273. Plaintiff brings this count on behalf of the California Subclass. For purposes of this count, Plaintiff will refer to the California Subclass as the "Class".

274. Under the California Consumer Records Act, any "person or business that conducts business in California, and that owns or licenses computerized data that includes personal information" must "disclose any breach of the system following discovery or notification of the breach in the security of the data to any resident of California whose unencrypted personal information was, or is reasonably believes to have been, acquired by an unauthorized person." Cal. Civ. Code § 1798.82. The disclosure must "be made in the most expedient time possible and without unreasonable delay" but disclosure must occur "immediately following discovery [of the breach], if the personal information was, or is reasonable believes to have been, acquired by an unauthorized person." *Id.* (emphasis added).

275. The Data Breach constitutes a "breach of the security system" of Defendant.

276. An unauthorized person acquired the personal, unencrypted information of Plaintiff and the California Subclass.

277. Defendant knew that an unauthorized person had acquired the personal, unencrypted information of Plaintiff and the California Subclass but to date, has failed to notify Plaintiff and the Class.

278. Defendant's failure to notify prevents Plaintiff and the California Subclass from taking appropriate measures from protecting themselves against harm.

279. Because Plaintiff and the California Subclass were unable to protect themselves, they suffered incrementally increased damages that they would not have suffered with timelier notice.

280. Plaintiff and the California Subclass are entitled to equitable relief and damages in an amount to be determined at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of themselves and Class Members, requests judgment against Defendant and that the Court grant the following:

A. For an Order certifying the Class and appointing Plaintiff and their Counsel to represent the Class;

B. For equitable relief, enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the Private Information of Plaintiff and Class Members;

C. For injunctive relief requested by Plaintiff, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members, including but not limited to an order:

i. prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

ii. requiring Defendant to protect, including through encryption, all data collected through the course of its business in accordance with all applicable regulations, industry standards, and federal, state or local laws;

iii. requiring Defendant to delete, destroy, and purge the personal identifying information of Plaintiff and Class Members unless Defendant can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiff and Class Members;

iv. requiring Defendant to provide out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their Private Information for Plaintiff's and Class Members' respective lifetimes;

v. requiring Defendant to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the Private Information of Plaintiff and Class Members;

vi. prohibiting Defendant from maintaining the Private Information of Plaintiff and Class Members on a cloud-based database;

vii. requiring Defendant to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

viii. requiring Defendant to engage independent third-party security auditors and internal personnel to run automated security monitoring;

ix. requiring Defendant to audit, test, and train its security personnel regarding any new or modified procedures;

x. requiring Defendant to segment data by, among other things, creating firewalls and controls so that if one area of Defendant's network is compromised, hackers cannot gain access to portions of Defendant systems;

xi. requiring Defendant to conduct regular database scanning and securing checks;

xii. requiring Defendant to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personal identifying information, as well as protecting the personal identifying information of Plaintiff and Class Members;

xiii. requiring Defendant to routinely and continually conduct internal training and education, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xiv. requiring Defendant to implement a system of tests to assess its respective employees'

knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendant policies, programs, and systems for protecting personal identifying information;

xv. requiring Defendant to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendant information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xvi. requiring Defendant to meaningfully educate all Class Members about the threats that they face as a result of the loss of their confidential personal identifying information to third parties, as well as the steps affected individuals must take to protect themselves;

xvii. requiring Defendant to implement logging and monitoring programs sufficient to track traffic to and from Defendant servers; and for a period of 10 years, appointing a qualified and independent third party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendant compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any deficiencies with compliance of the Court's final judgment;

D. For an award of damages, including actual, nominal, statutory, consequential, and punitive damages, as allowed by law in an amount to be determined;

E. For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

F. For prejudgment interest on all amounts awarded; and

G. Such other and further relief as this Court may deem just and proper.

**<u>DEMAND FOR JURY TRIAL</u>**

Plaintiff hereby demands that this matter be tried before a jury.

Dated: June 4, 2026

Respectfully submitted,

*/s/ Nathan R. Ring*

Nathan R. Ring
Nevada Bar No. 12078
**STRANCH, JENNINGS & GARVEY PLLC**

3100 W. Charleston Blvd., Ste. 208
Las Vegas, Nevada 89102
(725) 235-9750
nring@stranchlaw.com

Leanna Loginov*
**SHAMIS & GENTILE, P.A.**
14 NE 1st Ave, Suite 705
Miami, FL 33132
lloginov@shamisgentile.com
305-479-2299

**pro hac vice* forthcoming

***Counsel for Plaintiff and the Proposed Class***